UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KAISER GILL
     vs.              )

)

DEPARTMENT OF JUSTICE     )      Civil Action No. 15-cv-00824  (RMC)

AND                     )

FEDERAL BUREAU OF        )

INVESTIGATION          )

---

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**INTRODUCTION**

Plaintiff Kaiser Gill was a Special Agent with the Federal Bureau of Investigation ("FBI") from 2002 until 2006, when he was suspended for accessing law enforcement systems without authorization. He was a superb agent, who received the Department of Justice's highest award, the Attorney General Award for Excellence. Mr. Gill has always accepted responsibility for his actions. However, the Defendants FBI and Department of Justice ("DOJ") in deciding his punishment violated his constitutional rights by treating him differently because he is a Muslim and of Pakistani origin. Furthermore, defendants violated their own rules by improperly applying the standards by which security clearances are granted. Specifically, they intermingled foreign-born US citizens with citizens of a foreign country. Lastly, Defendant DOJ violated the Foreign Intelligence Surveillance Act ("FISA") by not providing Mr. Gill with notice that it was going to use information gathered via electronic surveillance.

Mr. Gill is not asking the court to second-guess the executive branch in issuing and revoking security clearances. Dep't of Navy v. Egan, 448 U.S. 518 (1988) is clear

that the court cannot second-guess the executive branch in security clearance matters. Plaintiff argues that Egan does not give the executive the right to make those security clearance decisions while violating employees' basic constitutional rights.  Even with Egan, the executive must follow and accord employees their basic constitutional rights. The plaintiff argues that the executive could not arbitrarily revoke security clearances of a particular group, be it Muslims, women, Hispanics, or African-Americans.  However, the Defendants argue that the courts are powerless to review these arbitrary revocations because Egan prohibits such review.  This interpretation is contrary to the law and does not make common sense.

Plaintiff argues that his protected liberty interest under the Fifth Amendment was taken away without due process. Defendants should not have considered 34 CFR § 147.4 Guideline B, Foreign Influence, because all his relatives are US citizens and not citizens of a foreign country.  His uncles are small businessmen who have been citizens of the United States for over 20 years.  His brother[1] was a US Navy officer, served as counsel in the White House for the George W. Bush Administration and later worked at Department of Homeland Security , while maintaining a TS/SCI clearance.  Yet, defendants still categorized them as non-US citizens.  Had it not been for the consideration of Guideline B, Mr. Gill would have been treated like other similarly situated agents and received a minor suspension.  Thus, application of Guideline B was a violation of his due process rights.

Defendants also violated his due process rights by violating FISA when they considered information gathered from electronic surveillance without providing prior notice.  Section 50 U.S.C. § 1806 is clear that notice needs to be provided.  None other

---

[1] The brother referred to in this matter is the counsel of record in this case.

than Office of Legal Counsel for DOJ opined that notice is required in adjudications before the Access Review Committee ("ARC").  Not providing notice deprived Mr. Gill of his right to defend himself against the information or have the information excluded.

Defendants erroneously argue that this Court does not have subject matter jurisdiction to decide the claims asserted by plaintiff Kaiser Gill.  The Court has subject matter jurisdiction over each claim asserted.

## FACTUAL BACKGROUND

Mr. Gill was born in 1974 in Karachi, Pakistan. Compl ¶ 8. He and his family immigrated to the United States in 1980. Id. Gill is of the Islamic faith. Compl ¶ 9.  In 1996, Gill graduated from the College of William & Mary and was commissioned in the United States Army as a second lieutenant. Compl ¶¶ 10, 11. In 1997, one year after joining the Army, Gill was deployed to Bosnia as part of Operation Enduring Freedom. Compl ¶ 12.  While in the Army, Gill was awarded the Meritorious Service Medal, the Army Commendation Medal, the Army Achievement Medal, Army Airborne School Parachutist Badge, Army Air Assault Badge, the Distinguished Graduate of Army Armor Basic Course, and Distinguished Graduate from Reserve Officers Training Corps. Compl ¶ 13.  In 2002, after an honorable discharge from the Army, Gill joined the FBI. Compl ¶ 14.  In 2005, Gill received the Attorney General Award for Exceptional Service, the highest award given to FBI agents. Compl ¶ 15.

In 2003, Gill accessed the FBI's Automated Case Support ("ACS") system after he learned that FBI agents visited his family members to ask questions about an immigration attorney who was an acquaintance. Compl ¶ 16.  Also, in 2003, Gill ran a search on family members and himself out of concern that they and he may also be

caught up in the investigation. Compl ¶ 17.  All of Gill's searches yielded no active cases on any of his family members. Compl ¶ 18.  In 2006, Gill voluntarily disclosed to his supervisor at the FBI that his family member had contacted him about a visit from an FBI agent. Compl ¶ 19.  Gill further disclosed this to the New York Security Unit.  Because of Gill's voluntary disclosure, he was required to take a polygraph. Compl ¶ 20.  During the polygraph, Gill's answers proved deceptive.  Id.

On August 11, 2006, the Security unit re-interviewed him. Compl ¶ 21. During the interview, Gill disclosed that he conducted searches on his family members and friends, and indirectly informed his brother that his phone was not being monitored by an agency. Id.  In 2006, the FBI suspended Gill and revoked his security clearance. Compl ¶ 22. At no time did Gill disclose any classified information to any individual. Compl ¶ 23

In August 2008, the FBI permanently revoked his security clearance. Compl ¶ 24 On August 18, 2008, FBI's Office of Professional Responsibility ("OPR") Unit informed Gill of their decision to terminate him for violating FBI policy against unauthorized searches of its computer systems and that his answers "lacked candor." Id.  Gill sought review of OPR's decision by the Assistant Director of OPR. Compl ¶ 25.  On February 19, 2009, Assistant Director a held a hearing of OPR. Id. In March 2009, the Assistant Director found that the preponderance of the evidence did not support a charge of no candor under oath and violation of Offense Code 3.5 and 4.9. Compl ¶ 26.

On October 17, 2008, Gill appealed the decision to revoke his security clearance to the Access Review Committee ("ARC") of the Department of Justice. Compl ¶ 27.  On April 30, 2009, the ARC held its hearing. Compl ¶ 28.  However, ARC did not rule until April 2, 2014. Pl Exhibit 1. Compl ¶ 28.  In it's ruling, ARC stated that the FBI was

concerned about Gill's "Foreign-born" relatives. Comp¶ 29. The ARC also stated that it did not doubt Gill's sincerity or remorse for his actions and his ability to change. Id.  The ARC considered several factors, one of which is Adjudicative Guideline B, Foreign Influence, which allows the ARC to consider foreign influence on an individual. Compl ¶ 30.

All of the family members whose records Gill searched through the ACS system are American citizens. Compl ¶ 31.  In Gill's brother's case, he is a US Navy Veteran, was Counsel at the White House Office of Homeland Security, and Department of Homeland Security. Compl ¶32.  He also held a Top Secret Special Compartmentalized Information clearance. Id.  No member of Gill's family has ever been indicted, let alone convicted. Compl ¶ 33.

During the ARC hearing, the FBI did not disclose that they had requested the National Security Agency to monitor the emails of Gill's brother, Faisal Gill, pursuant to the Foreign Intelligence Surveillance Act ("FISA"), 50 USC § 1801. Compl ¶ 34.  Under Sec 106(c) of FISA, the government is required to notify the aggrieved party before they use such evidence. Compl ¶ 35. Neither the ARC nor the FBI ever notified Gill that they intended to use information gathered from FISA electronic surveillance. Compl ¶ 36. Neither the ARC nor the FBI ever disclosed conversations between Gill and his brother obtained as a result of the electronic surveillance relied upon by the ARC. Compl ¶ 37.

It is clear that FBI and ARC used the NSA electronic surveillance information on Faisal Gill in its proceedings because senior members of the ARC requested a legal opinion from DOJ Office of Legal Counsel, ("OLC") in 2010, shortly after the ARC hearing. (Exhibit 2, Office of Legal Counsel Opinion). Compl ¶ 38.  Also, the only

reason the ARC provided for not overturning the decision of the FBI was the potential influence foreign-born relatives would have on Gill. (Exh 1). Compl ¶ 39.  ARC and the FBI in their decision to revoke his clearance clearly used Gill and his family members' Pakistani ethnic origin and their religious preference of being Muslims as key factors. Compl ¶ 40.   Had Gill or his family members been of another ethnicity or religion, FBI would not have revoked his clearance. Compl ¶ 41.  By revoking his clearance, Gill could no longer meet the requirements to be a special agent of the FBI. Compl ¶ 42. By having his security clearance revoked, Gill is no longer able to work in his field. Compl ¶ 43.  He cannot work for private contractors in the security field, nor can he apply for another law enforcement agency.  All require some form of a clearance. Id.

## LEGAL STANDARD

Mr. Gill bears the burden of proof of establishing subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  Roger v Tenet, 274 F. Supp. 2d 1, 5 (D.D.C. 2003) citing See Judicial Watch, Inc. v. FBI, 190 F. Supp. 2d 29, 32 (D.D.C. 2002).  In determining its jurisdiction, the Court must accept the allegations in the complaint as true and draw all reasonable inferences in Mr. Gill's favor. Id.  Such allegations, however, 'will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim. Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13-14 (D.D.C. 2001).

The Court must deny a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), unless Mr. Gill "can prove no set of facts in support of [his] claim which would entitle [him] to relief." Id. citing Kowal v. MCI Communications Corp., 305 U.S. App. D.C. 60, 16 F.3d 1271, 1276 (D.C. Cir.1994).  The court must accept all allegations in the

complaint as true and all reasonable inferences must be resolved in Mr. Gill's favor. Ranger 274 F. Supp 2d at 5 (citing Glymph v. District of Columbia, 180 F. Supp. 2d 111, 113 (D.D.C. 2001)). Mr. Gill need not prove that they will prevail at trial on the merits, only that they have stated a proper claim. Id.

## ARGUMENT

### I.     The DEFENDANTS VIOLATED MR. GILL'S EQUAL PROTECTION RIGHTS

**A. Title VII actions are non-justiciable in regards to security clearance decisions.**

As the government clearly outlined in their Motion to Dismiss, it is established law in this District that Title VII claims are prohibited for adverse employment actions based on denial or revocation of a security clearance. See Dep't of the Navy v. Egan, 448 U.S. 518 (1988); Oryszak v. Sullivan, 576 F.3d 522, 526 (D.C. Cir. 2009); Ryan v. Reno, 168 F.3d 520 (D.C. Cir. 1999). The Court of Appeals for the District of Columbia held in Reno that Title VII actions require the Court to review the substantive merits of the security clearance decision, and thus were prohibited under Egan. 168 F.3d at 523-24. However, the Court was careful to deter any broad interpretation of their holding and made it clear that the holding did not apply to "actions alleging deprivation of constitutional rights." Id at 524. Further, the Court held in United States Information Agency v. KRC, 905 F.2d 389 (1990), that the trial court erred when it did not consider a foreign service employee's Equal Protection claim surrounding the termination of his Foreign Service appointment. Here, Mr. Gill argues that he was deprived of his equal protection rights when the Defendants FBI and ARC considered his national origin and religion in determining his revocation of a security clearance. This Court should consider his Equal Protection claim just as the Court of Appeals in KRC required.

**B. The only principle <u>Egan</u> can stand for is that a court cannot second-guess the merits of security clearance decisions made by an Executive agency.**

The government in this case cites to <u>Egan</u> for the backbone of its argument that the court does not have jurisdiction to review this case because it cannot review security clearance decisions. 484 U.S. 518 (1988). In <u>Egan</u>, a civilian employee of the Navy requested that the Merit Systems Protection Board review the substance of the Navy's determination in denying him security clearance. Over the Navy's objection, the Board found that it had the authority to review the merits of the decision. <u>Id</u> at 521-23. Upon appeal to the Supreme Court, the Board's decision was overturned. The Court held that in determining the *narrow* issue of whether the Board had the authority by statute to review the *substance* of an underlying decision to revoke or deny clearance, such judgment must be done by "those with the necessary expertise in protecting classified information" and the Board did not have such expertise. <u>Id</u> at 520, 529-30. The employee did not challenge constitutional violations from the denial of the security clearance, nor did the Court hold that such challenges were denied judicial review.

In fact, "[i]t is simply not the case that all security clearance decisions are immune from judicial review." <u>Nat'l Fed'n of Fed. Employees v. Greenberg</u>, 983 F.2d 286, 289 (D.C. Cir. 1993). Just four months after the Supreme Court rendered its decision in <u>Dep't of the Navy v. Egan</u>, the Court held in <u>Webster v. Doe</u>. 486 U.S. 592 (1988), that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." <u>Id</u> at 603.

It is clear that the Supreme Court answered a very narrow question in <u>Egan</u> regarding the substantive review of security clearance decisions and it did not create a

blanket protection of all reviews of security clearance decisions. Thus, the government's argument that Egan precludes any and all review by this Court of the agency's actions in revoking Mr. Gill's security clearance holds no weight.

**C. Courts can review security clearance decisions to determine whether a constitutional right has been violated so long as they are not second-guessing the merits of the decision.**

The courts in this district have made it very clear that Egan does not apply to review of security clearance decisions on the basis that they have deprived an individual of their constitutional rights. See Ryan v. Reno, 168 F.3d 520, 524 (D.C. Cir. 1999) ("We emphasize that our holding is limited to Title VII discrimination actions and does not apply to actions alleging deprivation of constitutional rights."); Oryszak v. Sullivan, 576 F.3d 522, 526 (D.C. Cir. 2009) (Actions based upon denial of security clearance are committed to agency discretion by law, *at least where a constitutional claim is not properly presented*.); Wilson v. James, 2015 U.S. Dist. LEXIS 138984 at *51 (D.D.C. 2015) (Ryan v. Reno observes that Egan does not apply to actions alleging deprivation of constitutional rights.).

The United States District Court for the District of Columbia has applied such review of possible constitutional violations in security clearance denials when it reviewed the Secretary of Defense's policy denying security clearance to all recently naturalized citizens from 30 different countries. Hyunh v. Carlucci, 679 F.Supp. 61 (D.D.C. 1988). In Hyunh, two naturalized citizens of Vietnamese origin who were employed by the Department of Defense filed an action for injunctive relief challenging the constitutionality of the Secretary of Defense's policy that security clearances were denied to recently naturalized citizens from certain countries based on their national origin. Id at

62. The policy stated that any naturalized citizen from the specified countries were denied security clearance unless they had been a naturalized citizen for five years or more or they resided in the United States for at least ten years. Any naturalized citizen that did not meet that criteria could only gain limited access if a compelling need existed. Id at 63. The court held that discrimination based on national origin is subject to strict scrutiny and that government must show that the discrimination is a "necessary and precisely-tailored procedure for preserving national security." Id at 66-7. In finding that the government did not establish this, the court granted the injunction,

Just as in Hyunh, here Mr. Gill asks this court not to second-guess the merits of the decision to revoke his security clearance, but to review such procedure of his revocation to ensure that none of his constitutional rights were violated in the process.  This court can look to the sign of the times and the actions of an agency during eras of discrimination towards individuals of certain national origins to determine violations of constitutional rights. "[I]n interpreting the Equal Protection Clause, the Court has recognized that new insights and societal understandings can reveal unjustified inequality within our most fundamental institutions that once passed unnoticed and unchallenged." Obergefell v. Hodges, 135 S. Ct. 2584, 2603 (2015). During a time of heightened paranoia against Muslims or persons of Pakistani origin, it is valid to question whether the procedures used by the ARC in its decision to revoke security clearance from Mr. Gill did in fact violate his constitutional rights.

At this stage, Mr. Gill has made out a case that the ARC used considerations of his national origin and religion in order to revoke his security clearance, and such procedures allege a constitutional claim before this court. Mr. Gill is not asserting that

this court order an Executive agency to refrain from revoking his security clearance, but only that this Court order that in its determination of revocation of a security clearance (or less punitive means of action), an agency cannot consider national origin and religion. Until the agency does that, Mr. Gill is asking this Court to return him to his status prior to the defendant's violations.

If Egan stood for the principle that where security clearance decisions were involved, the Courts had zero authority to review, then under that analysis, the Executive branch could deny security clearances to all women, all African Americans, all Muslims or any other protected class with no accountability for those Constitutional violations. There is a "serious constitutional question" if the court denies a "judicial forum for a colorable constitutional claim." Webster v. Doe, 486 U.S. 592, 603 (1988). Egan stands for the simple principle that the Courts cannot second-guess the merits of security clearance decisions made by the Executive agency. It is not blanket authority to violate Constitutional rights at will.

## II.     GOVERNMENT VIOLATED MR. GILL'S DUE PROCESS RIGHTS UNDER THE FIFTH AMENDMENT

### A.     The Plaintiff has a valid liberty interest

Although a person does not have a property interest in a security clearance, a revocation of a security clearance violates the Due Process clause of Fifth Amendment when there is significant harm done to a person's liberty interest.  Courts have found two ways by which a state action can have an adverse impact on a persons liberty interest under the Fifth Amendment: (1) the state action has altered his status and stigmatized a person's reputation or (2) state action is broad enough and imposes a stigma that

precludes a person from continuing in their chosen profession. <u>Kartseva v. Dep't of State</u>, 37 F. 3d 1524, 1527 (D.C. Circuit 1994); <u>Doe v. Cheney</u>, 885F.2d 898, 910 (D.C. Cir 1989).

Under the first theory, the government must alter a person's status and stigmatize him at the same time. <u>Kartseva v. Det't of State</u>, 37F.3d at 1527.  The first theory of altering status and stigmatizing an individual can be met if the state terminated Mr. Gill. "The loss of government employment is the paradigmatic 'status change' in liberty interest jurisprudence." <u>Ranger v. Tenet</u> 274 F. Supp 2d 1, 8 (D.D.C 2003) (quoting <u>Doe v Casey</u>, 796 F. 2d 1508, 1522 (D.C. Cir 1986).  The government action must also be defamatory in nature.  In <u>Doe v. Cheney</u>, the court held that there was no stigma because the government did not make the accusation public.

The second theory under which government action may have such a stigma to affect liberty interest is if the government action precludes future employment opportunities in the person's chosen profession. <u>Ranger v. Tenet</u>, 274 F. Supp 2d at 8.  In <u>Graham v. United States,</u> 2002 U.S. Dist. LEXIS 27419; 2002 WL 32511002 (D.D.C 1995) the court stated

> "In such cases, the alleged liberty damage arises not from government speech, but rather from the imposition of a continuing harm associated with the employment action that either bars the individual (formally) from future government employment or that precludes him (formally or informally) from such a broad range of opportunities that it interferes with his constitutional right to pursue his chosen career. <u>Kartseva v. Dep't of State,</u> 308 U.S. App. D.C. 397, 37 F.3d 1524, 1528 (D.C. Cir. 1994); *see also* <u>Simpkins v. Shalala</u>, 999 F. Supp. 106, 118 (D.D.C. 1998). "In other words, government action precluding a litigant from future employment opportunities will infringe upon his constitutionally protected liberty interests only when that preclusion is either sufficiently formal or sufficiently broad." <u>Taylor v. Resolution Trust Corp.,</u> 312 U.S. App. D.C. 427, 56 F.3d 1497, 1506 (D.C. Cir. 1995)."

Thus, under the standard of this district, if the government action precludes the person from pursuing his or her chosen profession, then that action violates a person's liberty interest under the Fifth Amendment clause.

In the instant case, Mr. Gill satisfies both prongs of the <u>Cheney</u> test and as such the government action violates his liberty interest under the Fifth Amendment of the Constitution.   The FBI and DOJ revoked Mr. Gill's security clearance and terminated him.   The revocation of his security clearance clearly altered his status as a special agent with the FBI.   Since Mr. Gill did not have a security clearance, he could not continue to work as a special agent.   And thus, FBI terminated Mr. Gill.   As stated above, termination is the "paradigmatic 'status change' in liberty interest jurisprudence." <u>Ranger v. Tenet</u> 274 F. Supp 2d 1, 8 (D.D.C 2003) (quoting <u>Doe v Casey</u>, 796 F. 2d 1508, 1522 (D.C. Cir 1986).   Thus, his status was changed and liberty interest was affected.

The next question is whether there was defamation or stigma to Mr. Gill's reputation.   Both the FBI and DOJ said that Mr. Gill was "deceptive" and cannot be trusted.   In 2016, there is nothing more defamatory to a Muslim FBI agent than to have the government say that he is deceptive and untrustworthy.   At this stage of the litigation, it is impossible to ascertain how widely the FBI has disseminated the reasons for Mr. Gill's termination.   If any employer seeks documentation, Mr. Gill will have to show them documentation that states that he is deceptive and untrustworthy.   That is certainly stigmatizing.

Even if the Court finds that FBI did not stigmatize Mr. Gill through their words or by disclosing to others, Mr. Gill is precluded from pursuing any opportunities in his

chosen profession.  Every private employer in the security filed will require the ability to obtain a security clearance.  Mr. Gill cannot get a security clearance.  Also, with having a security clearance revoked from the FBI, he has no chance to work in the security field at all.  As such, government action has stigmatized him broadly enough to preclude him to continuing in his chosen profession.

Since it is clear that government action altered Mr. Gill's status through termination of his employment, and that the action did stigmatize him, rendering him unable to obtain employment in his chosen profession, Mr. Gill is deprived of his liberty interest under the Fifth Amendment.  The next question is whether the harm done was without due process of law.

**B. Government action was without due process of law**

Mr. Gill argues that government deprived him of his due process rights by: (1) not properly following the adjudicative guidelines for security clearances; (2) not providing him notice under Sec 106(c) of FISA; (3) by taking five years to decide his matter.

1. Government did not follow the adjudicative guide for security clearances because they improperly attributed foreign influence foreign-born US Citizens.

Executive Order 12968 sets for the standards by which access to classified information is granted.  Under Executive Order 12968 Sec. 2.1. "Eligibility Determinations. (a) Determinations of eligibility for access to classified information shall be based on criteria established under this order."  Under 34 CFR § 147.2, "[t]he ultimate determination of whether the granting or continuing of eligibility for a security clearance is clearly consistent with the interests of national security must be an overall common

sense determination based upon careful consideration of the following, each of which is

to be evaluated in the context of the whole person, as explained further below:

> **(1)** Guideline A: Allegiance to the United States.
> **(2)** Guideline B: Foreign influence.
> **(3)** Guideline C: Foreign preference.
> **(4)** Guideline D: Sexual behavior.
> **(5)** Guideline E: Personal conduct.
> **(6)** Guideline F: Financial considerations.
> **(7)** Guideline G: Alcohol consumption.
> **(8)** Guideline H: Drug involvement.
> **(9)** Guideline I: Emotional, mental, and personality disorders.
> **(10)** Guideline J: Criminal conduct.
> **(11)** Guideline K: Security violations.
> **(12)** Guideline L: Outside activities.
> **(13)** Guideline M: Misuse of Information Technology Systems."

Thus, the government is required to restrict its determination to these factors set forth

when deciding on security clearances.

One factor the government must consider is whether the applicant for the security

clearance has a close immediate family member or a close connection with someone who

is not a citizen of the United States. 34 CFR § 147.4 Guideline B.  Under 34. CFR §

147.4(b) Guideline B: Foreign Influence, the following condition could raise security

issues:

> (1) An immediate family member, or a person to whom the individual has close ties
> of affection or obligation, is a citizen of, or resident or present in, a foreign country;
> (2) Sharing living quarters with a person or persons, regardless of their citizenship
> status, if the potential for adverse foreign influence or duress exists;
> (3) Relatives, cohabitants, or associates who are connected with any foreign
> government;
> (4) Failing to report, where required, associations with foreign nationals;
> (5) Unauthorized association with a suspected or known collaborator or employee of
> a foreign intelligence service;
> (6) Conduct which may make the individual vulnerable to coercion, exploitation, or
> pressure by a foreign government;

(7) Indications that representatives or nationals from a foreign country are acting to increase the vulnerability of the individual to possible future exploitation, coercion or pressure;

(8) A substantial financial interest in a country, or in any foreign owned or operated business that could make the individual vulnerable to foreign influence.

The focus of Guideline B is to determine whether an applicant has a relationship, and if so how close, with a citizen of a foreign country.

Defendant FBI revoked Mr. Gill's clearance based primarily on the concern that Mr. Gill was under foreign influence by his family.  In its presentation before the ARC, the FBI stated that its decision to revoke the clearance was correct because of Mr. Gill's "ties to his foreign born relatives." Pl Exhibit 1.  The concern was that Mr. Gill was accessing sensitive information and at the behest of these foreign born close family members.  Thus under 32 CFR § 147.4(b), Guideline B, FBI could consider that and revoke his clearance.  Furthermore, if there is any doubt that Mr. Gill is under foreign influence, then that doubt must be resolved in favor of revocation.

The problem with Defendant FBI's analysis is that the foreign born relatives it refers to are all naturalized United States citizens. Therefore, 34 §CFR 147.4 Guideline B does not apply and should not have even been considered.  It is clear from the plain reading that Guideline B is referring only to citizens of foreign countries or employees of foreign governments.  None of the factors listed in 32§ CFR 147.4(b) exist in Mr. Gill's case.  The FBI is treating these U.S. citizens differently solely and only because of their nation origin.

Defendant DOJ through the Access Review Committee ("ARC"), simply ratifies the FBI's decision and analysis.  The ARC bases its decision to deny the appeal because of the perceived foreign influence by the foreign born relatives who are naturalized U.S.

citizens. The ARC mentions the FBI's analysis that the decision to revoke the clearance

was correct because of Mr. Gill's "ties to his foreign born relatives." Pl Exhibit 1. Thus,

Defendant FBI and Defendant DOJ are equating foreign born US citizens with foreign

citizens.  This is a clear misapplication of Guideline B.

  Both Defendant FBI and ARC refer to the fact that Mr. Gill accessed sensitive

law enforcement systems for his family.  Such actions are serious and lead to concerns

about Mr. Gill's ability to safeguard classified information. Pl Ex 1.  However, Mr. Gill is

not the only person to have ever accessed sensitive law enforcement files for personal

use.  Other FBI employees who wrongfully accessed sensitive law enforcement systems

or improperly disclosed classified information were given oral reprimands, simple

suspensions and letters of reprimands.  See Complaint ¶ 46-47.  From November 2004

through November 2008, the FBI's Discipline Review Board ("DRB") adjudicated 47

cases of employees improperly accessing sensitive law enforcement systems for

unauthorized use.  Of those 47, 26 resulted in minor suspensions, 11 in letters of

reprimand and 4 in oral reprimand.  See Complaint ¶ 46-47.  The significant difference

between those employees and Mr. Gill is that Mr. Gill is Muslim and of Pakistani origin.

  All doubts that the FBI and DOJ have about Mr. Gill come from the mistaken

belief that he has foreign relatives instead of U.S. citizens who happen to be naturalized.

In its decision letters, the ARC stated that it "does not question the sincerity of Mr. Gill's

expressions or remorse about his conduct or willingness to change his behavior" however

they had to resolve any doubts in favor of national security. Pl Ex 1.  Again, the concern

being that he might disclose to foreign relatives.

The misapplication of Guideline B deprived Mr. Gill of his due process rights under the Fifth Amendment.  Both FBI and DOJ should not have even considered Guideline B while deciding whether to revoke the security clearance.  As stated above, there was no foreign influence on Mr. Gill.  Every member of his family is a U.S. citizen thus not subject to Guideline B.  Since Mr. Gill's brother and uncles are U.S. citizens, none of the factors listed in 34 CFR 147.4 apply.  There was no person who had close ties to a foreign government.  Naturalized U.S. citizens should not be treated differently than native-born U.S. citizens.  Had the Defendants not applied Guideline B, then Mr. Gill would have been treated just like the many other agents who wrongfully accessed FBI databases for personal use and received a much lesser penalty.

B. **Defendant's failure to disclose that it had a FISA monitoring on Mr. Gill's brother violated his Due Process right under the Fifth Amendment**

It's a simple principle - if the government is going to use evidence gained from electronic surveillance, then it must notify the aggrieved party prior to using the information.  50 U.S.C. § 1806(c). Section 106 of the Foreign Intelligence Surveillance Act ("FISA") requires the government to notify an aggrieved person when the government intends to use information gained through the electronic surveillance against him in a legal proceeding. 50 USC § 1806(c), section 106.  In a June 3, 2011 legal opinion, the Office of Legal Counsel concluded that such notification is required at adjudications before ARC proceedings if the government intends to rely on information gained through the electronic surveillance.  Pl Ex 2 pg 8.

Thus, Defendant FBI and DOJ were required to notify Mr. Gill if any evidence gained from that electronic surveillance was used in the adjudication before the ARC.

The record is also clear that government provided no such notification.  In such a case, not providing notification prevents Mr. Gill from providing evidence to rebut the claims or allegations obtained from the electronic surveillance.  In order to have his due process right under the Fifth Amendment, Mr. Gill must have been given a "meaningful opportunity" to refute the charges against him. Doe v. Cheney 885 F. 2d at 910 (quoting Doe v. Casey, 796 F.2d at 1524 (DC Cir 1986)).  Not disclosing information to Mr. Gill gained from electronic surveillance deprives Mr. Gill of opportunity to refute those charges.

In the present case, Defendants DOJ and FBI used information gained through electronic surveillance in its decision to revoke Mr. Gill's security clearance.  On April 30, 2009, the ACR heard Mr. Gill's appeal. Pl Ex 1.  Ms. Mari Barr Santangelo chaired the ARC. Pl Ex 1.  On Jan 26, 2010, Ms. Santangelo requested an OLC opinion asking whether Section 106 of FISA applies to adjudication before the ARC. Pl. Ex 2 pg1 ft 1. Defendant DOJ asked OLC to consider:

> "that a Department component has revoked an employee's security clearance; that the loss of security clearance caused the component to discharge the employee; that the employee has appealed the component's security-clearance revocation decision to the ARC; and that, in the course of the ARC adjudication, the Department intends to justify the clearance revocation with the use of information it has "obtained . . . from an electronic surveillance" of communications that involved the employee. Id. § 1806(c)." Pl Ex 2 pg 2.

These are the same exact facts as those of the Mr. Gill.  The ARC did not issue its decision until April 2, 2014.  Pl Ex 1.  Therefore, the Defendants were required to notify Mr. Gill.

Defendants in their motion argue that Mr. Gill does not know whether this memo is referring to him and that "plaintiff's assertion that it was relied upon to justify the clearance decision is consolatory at best..." Def Mem to Dis pg 15.  First, unless it is a great coincidence that Ms. Mari Barr Santangelo chaired an ARC reviewing a case with the exact same set of facts as the present case, the memo is referring to Mr. Gill's case. Next, Mr. Gill is not making a guess that Defendants used the contents of the electronic surveillance to justify the clearance revocation.  Instead, Mr. Gill is relying on what Ms. Santangelo stated in her request for legal opinion.  Ms. Santangelo states that the "Department intends to justify the clearance revocation with the use of information it has "obtained . . . from an electronic surveillance" of communications that involved the employee."  As such, it is not a conclusory statement.  At this stage of the litigation, Mr. Gill has set forth enough facts so that the Court must assume that it is true.

Not notifying him denied Mr. Gill the ability to meaningfully challenge the information gathered by the electronic surveillance.  The defendants argue that plaintiff lacks standing to sue under Sec 106 of FISA because there was no harm.  This argument lacks merit, since not notifying Mr. Gill deprived him of his right to challenge or defend against the information.  That is grave harm.

From a practical standpoint, the lack of notification was quite harmful.  The FBI informed the ARC that plaintiff's brother, a person whom plaintiff had passed along information to, was under electronic surveillance by the National Security Agency. Certainly, such information concerning Muslims in 2009 would create doubt in anyone's mind. Mr. Gill was never told what was gathered through the surveillance, if anything. Mr. Gill could not assuage such doubt unless he directly addressed that issue and

informed the ARC how he can be trusted even though his brother was under surveillance.

Certainly, Mr. Gill needed to refute or put in proper context any information gained from

the electronic surveillance.  This is exactly the reason why Sec 106 exists.

C. The delay in reaching a decision violated Mr. Gill's due process rights.

The courts apply the four-part test set forth in Baker v. Wingo 407 U.S. 514, 92 S.

Ct. 2182 (1972) when determining whether delay has deprived an individual of his due

process rights under the Fifth Amendment.  United States v. Property Identified As 1213

34th Street, 1991 U.S. Dist. LEXIS 3226 (D.D.C. Mar. 18, 1991) (quoting United States

v. Eight Thousand Eight Hundred & Fifty Dollars ($8,850) in United States Currency,

461 U.S. 555, 103 S. Ct. 2005 (1983)).  Under the four-part Baker test (1) the length of

delay, (2) the reason for the delay, (3) the claimant's assertion of his right, and (4) the

prejudice to the claimant.  Id. at 9.

In the present case, it took five years for Mr. Gill to receive a decision on his

security clearance revocation.  Pl Ex 1.  The ARC hearing took place on April 30, 2009.

On Jan 2010, ARC sought clarification from OLC.  On June 3, 2011, ARC received the

OLC opinion.  From June 3, 2011 until Aril 2, 2014, the ARC issued no decision.  The

defendants have not provided a reason for why it took five years to reach a decision.  As

such, plaintiff satisfies parts 1 and 2 of the four-part Baker test.

For five years, Mr. Gill was unable to take any action because he had not

exhausted his administrative remedies.  As such, he was harmed.  Mr. Gill could not have

filed this action nor taken any other legal steps until the ARC issued its final decision.  As

aforementioned, Mr. Gill was already precluded from pursuing a career in his field of

security; he being able to seek redress was essential to his livelihood.  Mr. Gill was in a

state of uncertainty as to his status. Defendants argue that his security clearance was

revoked in 2008, thus no decision by the ARC only preserved the status quo.  Def Mot to

Dis at 27.  First, Mr. Gill had hoped that the ARC would rule in his favor and he would

be allowed to return.  Next, if that is the standard, then no appeal can ever satisfy the

Baker test.  Appeals always preserve the status quo for the appellant.  For five years, Mr.

Gill did not know his status and could not seek redress in court.  That is *per se* harm.

###   III.     Defendants violated Section 106 of Foreign Intelligence Surveillance Act by not providing notice prior to using evidence against Plaintiff.

In addition to the lack of notice being a violation of Mr. Gill's procedural due

process rights, it is also a violation of the Act itself.  Plaintiff is not asking the Court to

accept plaintiff's assessment of whether notice was required under Section 106 of FISA,

but rather that of the Office of Legal Counsel of the Department of Justice.  Pl Ex 2.  As

stated above, no less than OLC has opined that the requirements of under Section 106 of

FISA apply to adjudications before the ARC. Id.  Thus**,** defendants violated FISA when

they based their decision to revoke the termination of security clearance on information

gathered from electronic surveillance.  50 U.S.C. §1806(c).

To be clear, Mr. Gill is not challenging the surveillance itself, or even the

defendants' right to use the evidence gathered through the surveillance.  Mr. Gill is

challenging the government's right to use the information gathered without providing

prior notice, as required by 50 U.S.C. 1806(c).

Defendants argue that since government did not waive sovereign immunity, there

is no cause of action here.  Def. Mot to Dis at pg 12. Defendants would be correct if

plaintiff was suing under a tort theory and suing for money damages.  All cases cited by defendants involve plaintiffs filing suit against government for money damages.  In this matter, Mr. Gill is not seeking money damages for FISA violations.

Under the 50 U.S.C 1806, the Courts do have the right, and do review legality of FISA provisions. "As the Fourth Circuit has made clear, an ex parte and in camera review is the standard means for assessing the legality of surveillance conducted pursuant to FISA, and disclosure should occur—

> 'only where the court's initial review of the application, order, and fruits of the surveillance indicates that the question of legality may be complicated by factors such as "indications of possible misrepresentations of fact, vague identification of the persons to be surveilled, or surveillance records which include a significant amount of nonforeign intelligence information, calling into question compliance with the minimization standards contained in the order.'" United States v. Rosen, 447 F. Supp. 2d 538, 546 (E.D. Va. 2006) (quoting United States v. Belfield, 223 U.S. App. D.C. 417, 692 F.2d 141, 147 (4th Cir. 1982) (quoting S. Intelligence Rep. at 64).

Courts have also reviewed the legality in United States v. Squillacote, 221 F.3d 542, 553-54 (4th Cir. 2000); In re Grand Jury Proceedings, 856 F.2d 685, 688 n.3 (4th Cir. 1988); United States v. Nicholson, 955 F.Supp. 588, 592 & n.11 (E.D.Va. 1997); United States v. Dumeisi, 424 F.3d 566, 578-79 (7th Cir. 2005); [17]  United States v. Damrah, 412 F.3d 618, 624, 124 Fed. Appx. 976 (6th Cir. 2005); United States v. Johnson, 952 F.2d 565, 571-72 (1st Cir. 1991).   Interestingly, in none of those cases did the government withhold notice from the aggrieved party.

In each case above, the Court is deciding on the legality of the surveillance conducted under FISA and the procedure by which the government is using the information.  That is all the plaintiff is asking the court to do here.  Had the defendants

followed the rules and provided notification, Mr. Gill could have availed, himself of his rights 50 U.S.C. § 1806(e) and (f) and sought to strike the evidence.  However, now the damage is done.  Therefore, factors 3 and 4 are satisfied of the <u>Baker</u> test.

## IV.    THE RELIEF REQUESTED IS APPROPRIATE

Plaintiff is simply requesting that the Court preserve the status quo prior to the defendant's unconstitutional actions.  Defendants argue that this Court does not have the authority to grant a security clearance.  Mr. Gill is not asking this Court to grant a security clearance.  Mr. Gill had already met the standards required for a security clearance and was granted one by DOJ.  Mr. Gill would still have that security clearance had it not been for the defendants' wrongful actions.  Moreover, nothing prevents the FBI from revoking Mr. Gill's security clearance once he is reinstated if he does not meet the standard for security clearance.

Once an FBI agent is terminated, his or her security clearance is revoked.  Yet, despite this both the Merit Systems Protection Board ("MSPB") and Equal Employment Opportunity Commission ("EEOC") regularly adjudicate cases regarding termination of FBI agents.  If those terminations are not upheld, then the agents are reinstated.

The EEOC does have the ability to reinstate FBI agents, as such so do the Courts. Agents in the FBI can appeal their removal action to the EEOC if there are Title VII claims involved.  <u>See</u> 29 CFR § 1614.401. In such a case, the EEOC has the authority to reinstate the agent back to his non-discriminatory status.  <u>See</u> 29 CFR §1614.501(c).   In <u>Carole Marshall v. Holder</u>, 2009 EEOPUB LEXIS 3158 (EEOC 2009), the administrative law judge (AJ) held that the FBI termination of Ms. Marshall was motivated by reprisal

for her protected EEO activity. Id at 4.  Thus, AJ ordered her reinstated to the FBI with full back pay and benefits.  The Commission further upheld this decision.  Also, EEOC decisions are reviewable by Districts Courts.  29 CFR § 1614.407

Similarly, the MSPB also adjudicates appeals of agency removal actions of FBI agents with qualifying veteran preferences.  5 U.S.C. § 3330a(e)(1).  The MSPB can also reinstate as one of its remedies. Elgin v. Dep't of the Treasury, 132 S. Ct. 2126, 2130 (2012); 5 U.S.C. §§ 1204(a)(2).  And MSPB decisions are judicially reviewable. 5 U.S.C. § 7703(a)(1).  Thus at some point, whether by affirming the MSPB decisions or overturning them, Courts are ruling reinstatement.

Defendants further argue that this Court does not have jurisdiction and defendants did not waive sovereign immunity.  For reason discussed above, this Court has subject matter jurisdiction.

### V. Conclusion

For reasons stated above, plaintiff has met his burden under at this stage of the litigation to state a colorable claim.  As such, Court should deny defendants Motion to dismiss based on Rule 12(b)(1) and Rule 12(b)(6).

Respectfully Submitted,

/S/ FAISAL GILL_____
Faisal Gill (DC Bar 497312)
Gill Law Firm
1155 F Street
Suite 1050
Washington, DC 20005
310-418-6675

202-318-4331(fax)
fgill@glawoffice.com